# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA**

**v.**                                    **CRIMINAL NO. 1:24-cr-38-TBM-BWR-1**

**JESSE RAY McCUIN**

## <u>MEMORANDUM OPINION AND ORDER</u>

Jesse Ray McCuin is a 35-year-old convicted felon who was arrested on February 6, 2024. On April 23, 2024, a grand jury sitting in this District returned a one-count Indictment [3] against McCuin, charging him with violating Title 18, Sections 922(g)(1) and 924(a)(8) of the United States Code. McCuin has moved to dismiss [31] his Indictment, arguing that Section 922(g)(1) violates the Second Amendment, the Commerce Clause, and the Equal Protection principles of the Fifth Amendment.

The Government has met its burden to show that permanently disarming a felon with McCuin's predicate offenses does not offend the Nation's history and tradition of firearm regulation. Further, binding Fifth Circuit precedent forecloses McCuin's Commerce Clause challenge. And although it is unclear whether there is still binding precedent on Section 922(g)(1)'s constitutionality under Fifth Amendment Equal Protection principles, Section 922(g)(1) does not violate McCuin's Fifth Amendment rights.

Secondly, McCuin filed a Motion to Suppress [59] his statements made in a February 7, 2024, custodial interview with a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives. Because McCuin validly invoked his right to counsel after being properly advised of his *Miranda* rights, the Special Agent's questioning should have ended then. Accordingly, McCuin's

statements made after he requested an attorney be present at questioning are inadmissible at trial. For these and the reasons more fully discussed below, McCuin's Motion to Dismiss [31] is denied and his Motion to Suppress [59] is granted.

## I. BACKGROUND AND PROCEDURAL HISTORY

McCuin has a lengthy criminal history. In 2006, when he was a minor, he was charged with the taking away of a motor vehicle in Hancock County. [22], p. 4. Two years later, at age 19, McCuin pled guilty to the transfer of a controlled substance, participation in a drive-by shooting, and conspiracy to commit armed robbery. *Id.* at 4-5. For these crimes he was sentenced to 20 years in prison with 13 years suspended, followed by three years of post-release supervision. *Id.* After being released in 2015, he committed burglary in Florida, was found guilty by a jury, and was sentenced to four years. *Id.* at 6. McCuin was released from Florida state prison in October 2016 and had his Mississippi sentence reinstated for violating his post-release supervision. *Id.* at 4. He was discharged in 2022 due to the completion of his sentence. *Id.* McCuin was then arrested in June 2022 for disorderly conduct in failing to comply with law enforcement and for fleeing from a law enforcement vehicle. *Id.* at 6. For these charges he was credited for time served. *Id.* Later in 2022, he was arrested in Picayune after a high-speed pursuit with law enforcement and charged with being a felon in possession of a weapon, fleeing law enforcement, and a slew of minor traffic infractions. *Id.* at 7. These charges are pending as no indictment has yet been returned. *Id.* Nearly a year later, in August 2023, McCuin was arrested in Biloxi for resisting arrest, public intoxication, and for being in possession of controlled substances. *Id.* at 8.

The instant charge arises from McCuin's arrest on February 6, 2024, in Hancock County. *Id.* At a traffic stop that was initiated for improper driving, law enforcement officers identified

McCuin as a passenger and obtained consent to search the vehicle. *Id.* They saw a black bag, which contained a loaded Smith and Wesson .380 handgun, on the floorboard where McCuin was sitting. *Id.* There was an additional loaded magazine. *Id.* The deputies discovered McCuin's outstanding contempt of court warrant for failing to appear in relation to the 2023 Biloxi arrest. *Id.* McCuin was arrested and transported to the Hancock County Adult Detention Center. *Id.*

After McCuin was indicted on April 23,2024, he made his initial appearance before United States Magistrate Judge Robert P. Myers on July 16, 2024, at which time he was arraigned. The Court appointed the Federal Public Defender's office to serve as McCuin's counsel. On August 12, 2024, McCuin filed the instant Motion to Dismiss [31] his Indictment, arguing that McCuin's Section 922(g)(1) charge is unconstitutional in light of the Supreme Court's decisions in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022), and *United States v. Rahimi*, 602 U.S. 680, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024). The Government responded to the Motion on August 16, 2024, and McCuin filed a rebuttal on August 21, 2024. After the Fifth Circuit held in *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), that its prior Second Amendment jurisprudence was abrogated by the Supreme Court's *Bruen* and *Rahimi* opinions, the Court ordered supplemental briefing on the Motion to Dismiss in a September 19, 2024, text order. In a September 23, 2024, text order, the Court also directed the parties to address Section 922(g)(1)'s constitutionality under the Equal Protection Clause after *Diaz*.

After the supplemental briefing schedule was extended, the Government and McCuin filed their supplemental briefs on October 17 and October 18 of 2024, respectively. McCuin's first supplemental brief [55] did not address the Equal Protection Clause, so the Court entered a text order on October 18, 2024, directing McCuin to submit an additional brief complying with the

Court's September 23, 2024, text order. McCuin filed his second supplemental brief [58] on October 24, 2024.

McCuin then filed a Motion to Suppress [59] on November 12, 2024, which the Government responded to on November 22, 2024. In its Response [67], the Government conceded that McCuin made an unequivocal request for an attorney at approximately the eight minute and 20 second mark of McCuin's February 7, 2024, custodial interview. [67], p. 2. On February 25, 2025, the Court held a Motion Hearing on the Motion to Suppress [59], during which the Court viewed the video of McCuin's custodial interview. The Court ordered the Government to file a transcript of McCuin's interview into evidence and also ordered supplemental briefing on the Motion to Suppress [59]. The Government filed the transcript on March 5, 2025, and the Government and McCuin both filed their supplemental briefs on March 19, 2025. On April 18, 2025, the Court ordered the Government to file the video of McCuin's interview, which the Government did that same day.

Both the Motion to Dismiss [31] and Motion to Suppress [59] are now fully briefed and all relevant transcripts and videos have been filed with the Court. The Court will first analyze the Motion to Dismiss under the Second Amendment, before turning to McCuin's Commerce Clause and Equal Protection arguments. Second, the Court will address McCuin's Motion to Suppress to determine whether McCuin unequivocally requested an attorney before being subject to custodial interrogation.

## II. MOTION TO DISMISS

McCuin has moved to dismiss his indictment, arguing that Section 922(g)(1) violates the Second Amendment and is therefore facially invalid, and alternatively, that Section 922(g)(1) is

unconstitutional as-applied to him. [31]. Section 922(g)(1) makes it a crime for felons to possess a firearm: "It shall be unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1).

In a facial constitutional attack, a plaintiff must demonstrate "that no set of circumstances exists under which [the law] would be valid." *United States v. Stevens*, 559 U.S. 460, 472, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987)). "As-applied challenges require[] a court to determine whether a statute is administered unconstitutionally against a particular plaintiff." *Does #1-7 v. Abbott*, 345 F. Supp. 3d 763, 773-74 (N.D. Tex. 2018), *aff'd sub nom. Does 1-7 v. Abbott*, 945 F.3d 307 (5th Cir. 2019). Because McCuin has attacked Section 922(g)(1) both facially and as-applied to him, this Court will examine that statute in both contexts, beginning with the as-applied challenge. *See Diaz*, 116 F.4th at 467 (tackling Diaz's as-applied challenge first because it is "the narrower consideration") (quoting *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019)). To handle McCuin's as-applied challenge, the Court will first discuss recent Supreme Court and Fifth Circuit case law on the Second Amendment and Section 922(g).

## A. Section 922(g)(1) does not violate McCuin's Second Amendment rights

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II. In 2008, when the Supreme Court conducted its "first in-depth examination" of that amendment, it held that "[the Second Amendment] surely

elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *D.C. v. Heller*, 554 U.S. 570, 635, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). The Supreme Court explicitly recognized an individual's right to possess a firearm independent of service in a militia, so long as the firearm is being used for traditionally lawful purposes. *Id.* In the following years, the federal appellate courts "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022). But in 2022, the Supreme Court rejected the two-step framework, instead laying out its own two-step test. "[W]e hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. . . . [T]he government must demonstrate that the regulation is consistent with this Nation's historic tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historic tradition may a court conclude than the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961)).

### i. Prior Fifth Circuit Precedent

In 2001, nearly seven years before the Supreme Court's landmark *Heller* decision, the Fifth Circuit became the first circuit to adopt the "individual rights model"—holding that the Second Amendment protects an individual right to possess a firearm independent of militia service. *United States v. Emerson*, 270 F.3d 203, 220 (5th Cir. 2001). It opted for the individual rights model instead of the other two then-existing models being applied by fellow circuits: the "collective rights" and "sophisticated collective rights" models. *Id.* at 219. The collective rights model held that the

Second Amendment provided no individual right, but merely empowered a state to arm its militia. *Id.* at 218. On the other hand, the sophisticated collective rights model permitted an individual right to firearm ownership, but only for individuals actively participating in a state militia, and only if the corresponding state or federal government failed to provide the necessary arms for militia service. *Id.* at 219. Though it rejected these two models, the Fifth Circuit held that Second Amendment rights may "be made subject to any limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *Id.* at 261. But, the Fifth Circuit added, "[I]t is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms." *Id.*

In 2003, the Fifth Circuit extended *Emerson*, which had analyzed Section 922(g)(8),[1] to Section 922(g)(1) and found that Section's felons-with-firearms prohibition constitutional. *United States v. Darrington*, 351 F.3d 632, 635 (5th Cir. 2003). "[W]e read *Emerson* as excluding felons as a class from the Second Amendment's protection . . ." *Id.* The Fifth Circuit again held 922(g)(1) constitutional in *Everist*: "922(g)(1) represents a limited and narrowly tailored exception to the freedom to possess firearms, reasonable in its purposes and consistent with the right to bear arms protected under the Second Amendment." *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004). Then, in 2009, after the Supreme Court decided *Heller*, the Fifth Circuit reaffirmed *Darrington* and the constitutionality of 922(g)(1): "*Heller* provides no basis for reconsidering *Darrington*." *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009); *see also United States v.*

---

[1] Section 922(g)(8) makes it a crime for someone subject to a court order that "restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child" from possessing a firearm. 18 U.S.C. § 922(g)(8).

*Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) ("Prior to *Heller*, this circuit had already recognized an individual right to bear arms, and had determined that criminal prohibitions on felons (violent or nonviolent) possessing firearms did not violate that right.").

In *Heller*, the Supreme Court seemed to affirm in dictum the constitutionality of felon-with-firearm restrictions: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . ." *Heller*, 554 U.S. at 626. And some of the concurrences in *Bruen* seemed to clarify that the *Heller* dictum regarding felon-with-firearm laws remained undisturbed by the Supreme Court's holding in *Bruen*. "[T]oday's decision therefore holds that a State may not enforce a law . . . that effectively prevents its law-abiding residents from carrying a gun for [self-defense]. That is all we decide. Our holding decides nothing about who may lawfully possess a firearm . . ." *Bruen*, 597 U.S. at 71-72 (Alito, J., concurring). "Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 80-81 (Kavanaugh, J., concurring) (citing *Heller*, 554 U.S. at 636; *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) (reiterating *Heller*'s dictum that the opinion did not cast doubt on felon-with-firearm prohibitions)).

In *Rahimi*, the Supreme Court provided additional context for *Heller* and *Bruen*, stating that "*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. Indeed, *Heller* stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" (*United States v. Rahimi*, 602 U.S. 680, 682, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024) (quoting *Heller*, 554 U.S., at 626, 627, n.26.)). The *Rahimi* dissent argued that the "passing reference in *Heller* to laws banning felons and others from possessing firearms . . . is dicta." *Rahimi*, 602 U.S. at 773 n.7. But

district courts can be bound by such dicta, "especially when it is 'recent and detailed.'" *Hollis v. Lynch*, 827 F.3d 436, 448 (5th Cir. 2016) (quoting *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013)).

Of course, the Fifth Circuit is a "strict *stare decisis* court." *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 782 (5th Cir. 2012) (citing *Bowcock v. Cont'l Airlines, Inc.*, No. 10–20856, 2011 WL 2672521, *3 (5th Cir. July 8, 2011)). And, district courts in the Fifth Circuit are "bound by a circuit decision unless or until it is overturned by an *en banc* decision of the circuit court or a decision of the Supreme Court." *La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 430 (W.D. Tex. 2022); *see Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991). A district court must adhere to a prior panel's interpretation "unless that interpretation is irreconcilable with" a later Supreme Court decision. *Carter v. S. Cent. Bell*, 912 F.2d 832, 840 (5th Cir. 1990). "[F]or a Supreme Court decision to override a Fifth Circuit case, the decision must unequivocally overrule prior precedent; mere illumination of a case is insufficient." *United States v. Petras*, 879 F.3d 155, 164 (5th Cir. 2018) (quotation omitted).

### ii.  The Fifth Circuit Holds its Prior Precedent is Abrogated

Before the *Diaz* decision issued, this Court was considering the Government's argument that prior Fifth Circuit precedent and Supreme Court dicta concerning Section 922(g)(1) were undisturbed by *Bruen* and *Rahimi*. *See United States v. Schnur*, 684 F. Supp. 522, 526-27 (S.D. Miss. 2023) ("[D]istrict courts 'have no power to declare that an intervening Supreme Court case inters an otherwise-binding Fifth Circuit case.'") (quoting *United States v. Jordan*, 650 F. Supp. 3d 531, 538 (W.D. Tex. 2023)), *aff'd*, 132 F.4th 863 (5th Cir. 2025). But when a Fifth Circuit panel handed down *Diaz* on September 18, 2024, it held that the Supreme Court's *Bruen* and *Rahimi* decisions

abrogated prior Section 922(g)(1) precedent in this circuit. *Diaz*, 116 F.4th at 465. While the *Diaz* panel acknowledged that a Fifth Circuit panel may not generally overrule circuit precedent, "[u]nder the rule of orderliness, a later panel may overturn another panel's decision when it has 'fallen unequivocally out of step with some intervening change in the law.'" *Id.* (quoting *In re Bonvillian Marine Servs., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021)). The *Diaz* panel held that the Supreme Court's *Bruen* decision "constitutes such a change, 'rendering our prior precedent obsolete.'" *Id.* (quoting *United States v. Rahimi*, 61 F.4th 443, 451 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688, 216 L. Ed. 2d 1255 (2023), and *rev'd and remanded*, 602 U.S. 680, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024)). And although the Supreme Court's *Rahimi* decision only overruled the Fifth Circuit's interpretation of Section 922(g)(8), the fact that "[t]he Supreme Court in *Rahimi* declined to even mention *Emerson*, which would have been directly on point to its consideration of § 922(g)(8) . . . mandates that we abandon that prior precedent." *Diaz*, 116 F. 4th at 465; *see Gahagan v. U.S. Citizenship & Immigr. Servs.*, 911 F.3d 298, 302–03 (5th Cir. 2018) ("That two decisions involve different statutes is not dispositive. Sometimes a Supreme Court decision involving one statute implicitly overrules our precedent involving another statute."). Therefore, the *Diaz* panel found that *Darrington*, which dealt with Section 922(g)(1) and relied on *Emerson*'s Second Amendment analysis under the abandoned means-end test, was obsolete. *Id.* This also rendered *Darrington*'s progeny obsolete.

In *Diaz*, the Government argued that even if Section 922(g)(1) Fifth Circuit precedent is no longer binding, the statements in *Heller*, *Bruen*, and *Rahimi* approving of longstanding restrictions on felons possessing firearms are. The panel rejected this argument too, finding that "[t]he mentions of felons in those cases are mere dicta." *Id.*; *see Int'l Truck & Engine Corp. v. Bray*,

372 F.3d 717, 721 (5th Cir. 2004) ("A statement is dictum if it 'could have been deleted without seriously impairing the analytical foundations of the holding' and 'being peripheral, may not have received the full and careful consideration of the court that uttered it.'") (quoting *Gochicoa v. Johnson*, 238 F.3d 278, 286 n.11 (5th Cir. 2000)). Although recent and detailed Supreme Court dicta is typically binding on lower courts, "none of those cases actually concerned § 922(g)(1), [and] they are not binding precedent on the issue now before us. The Court did not complete any historical analysis of laws forbidding felons from possessing firearms, as required by *Bruen*." *Diaz*, 116 F.4th at 466. The *Diaz* panel decided to take up that analysis itself: "Without precedent that conducts *Bruen*'s historical inquiry into our Nation's tradition of regulating firearm possession by felons in particular, we must do so ourselves." *Id*. Accordingly, this Court too must conduct its own historical inquiry to ensure that disarming McCuin squares with the Nation's history and tradition of firearm regulation.

### iii. McCuin's As-Applied Challenge

Much of the post-*Bruen* litigation among lower courts has dealt with whether a particular defendant constituted a member of "the people." *Heller*, 554 U.S. at 580. If a defendant did not qualify, then under the Second Amendment's plain text, "the right of the people to keep and bear Arms" did not apply to him. *See, e.g., United States v. Letterman*, No. 1:23-CR-66-HSO-BWR-1, 2023 WL 7336562, *4, 8 (S.D. Miss. Nov. 7, 2023). According to the Government, under the *Bruen* two-step approach, felonious conduct was not among that which the Second Amendment protects by its plain text, and so, felons could be excluded categorically from firearm possession without the Government needing to reach the second step—to meet its burden of showing historical analogues. *Id*. at *8 (citing *United States v. Daniels*, 77 F.4th 337, 343 (5th Cir. 2023) (holding that the phrase

"law-abiding" in *Heller* and *Bruen* was "short-hand" to exclude felons as those who were historically "stripped of their second Amendment rights"), *cert. granted, judgment vacated*, 144 S. Ct. 2707, 219 L. Ed. 1313 (2024)).

Here, the Government argues that under *Heller*, felons such as McCuin are not among "the people" protected by the Second Amendment because they are not members of the political community. [36], p. 12. But *Diaz* mandates a different conclusion. *Diaz*, 116 F.4th at 466. "[A]ll people have the right to keep and bear arms," but "history and tradition support Congress's power to strip certain groups of that right." *Id.* (citing *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)). The Supreme Court, in *Rahimi*, "affirmed this approach, assuming that Rahimi was protected by the Second Amendment, even though he had committed 'family violence.'" *Diaz*, 116 F.4th at 466 (citing *Rahimi*, 144 S. Ct. at 1898). Justice Thomas stated in his *Rahimi* dissent that it was "undisputed" that the Second Amendment applied to Rahimi, quoting *Heller* that the term "the people . . . unambiguously refers to all members of the political community, not an unspecified subset." *Rahimi*, 602 U.S. at 752 (Thomas, J., dissenting) (quoting *Heller*, 554 U.S. at 580). Justice Gorsuch reached the same conclusion. "In this case, no one questions that the law Mr. Rahimi challenges addresses individual conduct covered by the text of the Second Amendment." *Id.* at 1907 (Gorsuch, J., concurring). Accordingly, the Fifth Circuit held that even as a felon, the Second Amendment applied to Diaz. *Diaz*, 116 F.4th at 466. If the Second Amendment applies even to a felon, then the two-step *Bruen* analysis "effectively collapse[s] into one question: whether the law is consistent with our Nation's history of firearm regulation." *Id.* (citing *Rahimi*, 144 S. Ct. at 1898.).

McCuin, felon though he may be, therefore falls within the ambit of the Second Amendment. The Government must show that disarming him does not offend the Nation's history and tradition. "The plain text of the Second Amendment covers the conduct prohibited by Section 922(g)(1)." *Diaz*, 116 F.4th at 467. "The burden thus shifts to the Government to demonstrate that regulating [McCuin's] possession of a firearm is 'consistent with the Nation's historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*, 597 U.S. at 24). To meet its burden, the Government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30. The historical analogue provided must be "relevantly similar" to the challenged law. *Id.* at 29. To determine similarity, courts consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* The Government has proffered historical analogues pertaining to McCuin's criminal convictions for drive-by-shooting, burglary, and transporting a controlled substance. The Court must determine whether these analogues point to a sufficient historical basis for disarming felons with such convictions.

### a. Drive-By-Shooting Conviction

The first of McCuin's predicate offenses is his 2008 drive-by-shooting conviction. In Mississippi, a person commits a drive-by-shooting when he attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life by discharging a firearm while in or on a vehicle. MISS CODE ANN. § 97-3-109. But motor vehicles did not exist at the time of the Founding. The Government therefore analogizes McCuin's drive-by-shooting conviction to an aggravated assault conviction, a crime that did exist at the Founding. [54], p. 2-3. The only difference between

Mississippi's drive-by shooting statute and its aggravated assault statute is the motor vehicle element. *See* MISS. CODE ANN. § 97-3-7(2)(a) ("A person is guilty of aggravated assault if he or she (i) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; (ii) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm . . .").

As the Government admits, assault and battery were generally considered misdemeanors, not felonies, at the time of the Founding. [54], p. 4 (citing 4 William Blackstone, *Commentaries on the Laws of England* 216 (1769)). But that does not necessarily disqualify McCuin's conviction from serving as a Section 922(g)(1) predicate offense. "At the time of our Nation's birth, 'felony' was 'a term of loose signification.'" *Diaz*, 116 F.4th at 468 (citing *The Federalist No. 42*, at 228) (James Madison)). The category was "a good deal narrower" then. *Diaz*, 116 F.4th at 468. "Many crimes classified as misdemeanors, or nonexistent, at common law are now felonies." *Tennessee v. Garner*, 471 U.S. 1, 14, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985). Felonies at the time of the Founding were defined as offenses "which occasion[] a total forfeiture of either lands, goods, or both . . . and to which capital or other punishment may be superadded, according to the degree of guilt." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (citing 4 William Blackstone, *Commentaries on the Laws of England* 95 (Harper ed. 1854)). Notably, felonies in England at that time included violent crimes like murder and rape, but also crimes considered much less severe today, like counterfeiting and embezzlement. *Medina*, 913 F.3d at 158.

The *Diaz* panel recognized that at the time of the Founding, the Government could prevent people who had committed crimes or were "quarrelsome" from accessing weapons. *Diaz*, 116 F.4th

at 468 (citing Samuel Johnson, *A Dictionary of the English Language* (5th Ed. 1773) (defining "unpeaceable")); *see Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("[L]egislatures have the power to prohibit dangerous people from possessing guns."). The panel cited the same "going armed" laws that the Supreme Court found in *Rahimi* to be a relevant historical analogue to Section 922(g)(8). *Diaz*, 116 F.4th at 470-71 (citing *Rahimi*, 144 S. Ct. at 1901). These laws punished "those who had menaced others with firearms" and authorized forfeiture of weapons as a punishment. *Id.* (citing *Rahimi*, 144 S. Ct. at 1900) (remaining citations omitted). The justification behind going armed laws was to "mitigate threats of physical violence." *Id.* at 471 n.5 (citing *Rahimi*, 144 S. Ct. at 1901). And they "support[] a tradition of disarming individuals . . . pursuant to § 922(g)(1), whose underlying convictions stemmed from the threat and commission of violence with a firearm." *United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) (finding aggravated assault to be a sufficient predicate offense).

To be sure, McCuin's drive-by-shooting conviction was a violent crime. In achieving this crime, McCuin discharged a firearm—a deadly weapon—with a manifest extreme indifference for the value of human life. *See* MISS. CODE ANN. § 97-3-7(2)(a). In the Founding-era, capital punishment was the standard for a bevy of crimes less serious than a drive-by-shooting, including forgery and horse theft. *See Baze v. Rees*, 553 U.S. 35, 94, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008) (Thomas, J., concurring in the judgment) (citing Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Permanently disarming McCuin for this crime does not punish him "to an extent beyond what was done at the Founding, given the government's evidence that crimes such as theft were punished so severely and permanently." *Diaz*, 116 F.4th at 469 (citation omitted).

This Court finds that permanently disarming McCuin for his drive-by-shooting conviction comports with the historic tradition of firearm regulation in this country.

### b. Burglary Conviction

McCuin's 2015 burglary conviction is analogous to Diaz's predicate offense for vehicle theft. Burglary is a "species of theft." *United States v. Benkowich*, No. 1:24-cr-57-HSO-RPM-1, 2024 WL 4555392, *2 (S.D. Miss. Oct. 23, 2024) (citing "Theft," *Black's Law Dictionary* (12th ed. 2024) ("1. The wrongful taking and removing of another's personal property with the intent of depriving the true owner of it; larceny. 2. Broadly, any act or instance of stealing, including larceny, *burglary*, embezzlement, and false pretenses.") (emphasis added)). At the time of the Founding, English common-law felonies consisted of murder, rape manslaughter, robbery, sodomy, larceny, arson, mayhem, and burglary. *Jerome v. United States*, 318 U.S. 101, 108 n.6, 63 S. Ct. 483, 87 L. Ed. 640 (1943); Wayne R. LaFave, *Criminal Law*, § 2.1(b) (5th ed. 2010).

A conviction for burglary was punished with the death penalty in several Founding-era states, such as Vermont, Connecticut, and Massachusetts. Statutes of the State of Vermont, Passed by the Legislature in February and March 1787 (Windsor, VT: George Hough & Alden Spooner, 1787), 68-69. An Act for the Punishment of Divers Capital and Other Felonies, § 4 – Burglary and Robbery. Passed March 8, 1787; 1783 Conn. Acts 633, An Act For The Punishment of Burglary and Robbery; *see United States v. Quiroz*, 125 F.4th 713, 720 n.36 (5th Cir. 2025) ("In Massachusetts, a 1784 statute made burglary in the nighttime punishable by death.") (citing *Commonwealth v. Hope*, 39 Mass. 1, 9, 22 Pick. 1 (Mass. 1839)). In New York, crimes such as burglary, robbery, arson, malicious maiming and wounding, and counterfeiting were subject to estate forfeiture. *United States v. Contreras*, 125 F.4th 725, 731 (5th Cir. 2025) (citing 2 Laws of the State of New York Passed at

the Sessions of the Legislature (1785-1788) at 664-65 (1886)). And Massachusetts also punished the crime of theft with estate forfeiture. *Diaz*, 116 F.4th at 468 (citing 2 Records of the Court of Assistants of the Colony of the Massachusetts Bay 1630-1692, at 32 ( John Noble ed., 1904)).

The above statutes "establish a historical tradition of permanently punishing certain offenders who the evidence shows would have been considered felons . . . at the time of the Founding." *Diaz*, 116 F.4th at 469. And as the *Diaz* panel held, "our country has a historical tradition of severely punishing people . . . who have been convicted of theft." *Id.* at 468-69. Because burglary was a felony at the Founding and "would have led to capital punishment or estate forfeiture," disarming a defendant convicted of burglary fits within the Nation's tradition of regulating firearms. *United States v. Schnur*, 132 F.4th 863, 870-71 (5th Cir. 2025) (quoting *Diaz*, 116 F.4th at 469-70). Further, very recently, the Fifth Circuit held that burglary was a sufficient predicate offense to "support the constitutionality of § 922(g)(1) as applied to" the defendant. *Id.* at 870. Accordingly, McCuin, who has been convicted of burglary, "fits neatly" within the Nation's historic tradition of firearm regulation. *Diaz*, 116 F.4th at 471 (citing *Rahimi*, 144 S. Ct. at 1901). So, using his burglary conviction as a predicate offense to permanently disarm him does not violate the Second Amendment.

### c.   Transferring Controlled Substances Conviction

"'Illegal drug trafficking is a largely modern crime' with no direct historical analogue." *United States v. Reichenbach*, No. 4:22-cr-00057, 2023 WL 5916467, *6 (M.D. Pa. Sept. 11, 2023) (quoting *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023)). But, "'[m]odern regulations that were unimaginable at the Founding' need only be 'relevantly similar' to [a historical analogue]." *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) (quoting *Bruen*, 597

U.S. at 26), *cert. granted, judgment vacated sub nom. Garland v. Range*, 144 S. Ct. 2706, 219 L. Ed. 2d 1313 (2024). The Supreme Court has found that "drugs and guns are a dangerous combination." *Smith v. United States*, 508 U.S. 223, 240, 113 S. Ct. 2050, 124 L. Ed. 2d 138 (1993). Numerous district courts in the Fifth Circuit have found, after *Diaz*, that the Nation's history and tradition support restricting the firearm access of those with prior drug trafficking convictions. *See United States v. Barfield*, No. 2:24-cr-00007-01, 2024 WL 4859094, *2 (W.D. La. Nov. 21, 2024); *United States v. Robinson*, No. CR 22-253, 2024 WL 4827375, *7 (E.D. La. Nov. 19, 2024); *United States v. Hendrickson*, No. 3:23-cr-00418-E, 2024 WL 5113495, *4-5 (N.D. Tex. Dec. 13, 2024); *United States v. Carter*, No. CR 23-22, 2024 WL 4723236, *7 (E.D. La. Nov. 8, 2024); *United States v. Mack*, No. 3:24-cr-00244, 2025 WL 221808, *3 (W.D. La. Jan. 16, 2025); *United States v. Wilson*, No. CR 22-238, 2024 WL 4436637, *5 (E.D. La. Oct. 6, 2024).

In this case, the Government points to the historical evidence considered in *Reichenbach*, namely those sources illustrating that, in the Founding era, people "perceived as dangerous," "those considered dangerous to the state," "those who . . . would threaten the orderly functioning of society," those who were a "threat to public safety," and those presenting an "unacceptable risk of danger" could be disarmed. *Reichenbach*, 2023 WL 5916467, at *7, n.81. The Government also likens modern laws punishing those with drug convictions to those historic laws punishing those trafficking in other types of contraband. [54], p. 5. Virginia punished with death those knowingly receiving a stolen horse. 6 William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619*, page 130 (1819) (1748 law). The Second United States Congress made the theft of mail punishable by death. An Act to Establish the Post-Office and Post Roads within the United States, § 17 1 Stat. 232, 237 (1792).

Further, the Government also highlights how the federal government and at least two states punished with death the counterfeiting and forgery of public securities. An Act for the Punishment of Certain Crimes Against the United States, §§ 115, 1 Stat. 112, 115 (1790); 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 260-61 (1886) (1786 law); 9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 302 (1821) (1777 law). In *Wilson*, the Eastern District of Louisiana found that these exact sources qualified as "relevantly similar" evidence to support a historic tradition of severely punishing people who have been convicted of possessing and trafficking contraband. *Wilson*, 2024 WL 4436637, at *4.

Although this Court is skeptical that counterfeiting and forgery laws may serve as effective historical analogues for the modern-day offense of transporting a controlled substance, what is obvious to the Court is that McCuin's conviction for the transfer of methamphetamine is a dangerous crime. And there is undoubtedly a long history in this country of disarming people who are dangerous. As Justice Barrett began in her *Kanter v. Barr* dissent, when she was a judge on the Seventh Circuit: "History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are *dangerous*. Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) (emphasis original).[2]

---

[2] The ancient English "going armed" laws shaped the understanding at the Founding that the carrying of arms should not disturb the peace. *See* 5 Philip B. Kurland & Ralph Lerner, *The Founders' Constitution* 209, 214 (1987) (citing Sir John Knight's Case, 87 Eng. Rep. 75 (K.B. 1686) (the 1328 Statute of Northampton prohibited "going or riding armed in affray of peace"); William Rawle, A VIEW OF THE CONSTITUTION OF THE UNITED STATES 125-26 (2d ed. 1829) ("This right [to bear arms] ought not, however, in any government, to be abused to the disturbance of the public peace.")).

In a recent opinion, this Court discussed at length the dangerous and harmful effects of methamphetamine trafficking. *See United States v. Thomas*, No. 1:21-cr-39-TBM-RHWR, 2024 WL 5108451, *5-7 (S.D. Miss. Dec. 13, 2024). To start, methamphetamine is a synthetic stimulant that triggers the release of dopamine, serotonin, and norepinephrine that overwhelm the pleasure center of the brain and provide a sensation of euphoria, a "high" that can last for up to 15 hours. *Id.* at *6. Methamphetamine also blocks the re-uptake of dopamine, which leads to a higher concentration of dopamine and makes the drug highly addictive. *Id.* Additionally, it "increase[s] activity in the central nervous system when ingested orally, snorted, injected, or smoked." *Id.* The use of methamphetamine "may result in tachycardia (i.e., rapid heartbeat), hypertension (i.e., high blood pressure), anxiety or *agitation*, and even *death*," and "long-term use of methamphetamine can cause damage to the brain and permanent neurological damage, manifesting in *paranoia*, *violent behavior*, insomnia, and hallucinations." *Id.* (emphasis added). When taken in large doses, "methamphetamine may result in an overdose death from stroke, heart attack, or organ failure caused by overheating." *Id.* Data from the Centers for Disease Control and Prevention reflects that overdose deaths from psychostimulants, most of which are methamphetamine, increased 703 percent from 2011 to 2021. *Id.* (citing United States Sentencing Commission, Methamphetamine Trafficking Offenses in the Federal Criminal Justice System, June 2024, PDF p. 10; publication pagination p. 6).[3] And DEA data shows that the average potency of methamphetamine found in the United States in 2019 had increased roughly 30 percent since 2011. *Id.* (citing United States Sentencing Commission at p. 13, publication pagination p. 9).

---

[3] www.ussc.gov/sites/default/files/pdf/research-and-publications/research- publications/2024/202406_Methamphetamine.pdf

The dangers of trafficking methamphetamine are also on the rise. As the U.S. Sentencing Commission has pointed out, over the last 30 years methamphetamine has evolved from a small problem to "the most prevalent drug in the federal criminal justice system." *Id.* at *5-6 (citing United States Sentencing Commission at p. 6, publication pagination p. 2). As of 2022, methamphetamine offenses accounted for approximately one-half of all drug trafficking offenses sentenced in the federal system. *Id.* at *6.

This Court sees the dangers of methamphetamine on a near daily basis, based on the cases that come before it. "[M]ethamphetaine offenses are extremely serious and the threat to the health and safety of the community is not improving." *Id.* at *7. Relevant to this case, McCuin has been convicted of transferring a drug that causes agitation, paranoia, violent behavior, and in some cases, death. There can be no question that this constitutes a dangerous offense. Just as at the Founding, those who were perceived as dangerous or a threat to society, and those who trafficked in contraband could be disarmed, McCuin can be disarmed for this conviction.

In sum, the permanent disarmament of a felon convicted of drive-by-shooting, burglary, and transporting a controlled substance does not offend the Nation's history and tradition of firearm regulation. These are not the type of nondangerous crimes that might warrant the Court to dismiss McCuin's charges. For example, the Third Circuit recently enjoined enforcement of Section 922(g)(1) to a man convicted of food-stamp fraud more than twenty years earlier. *Range v. Att'y Gen. United States*, 124 F.4th 218, 232 (3d Cir. 2024). In that case, the en banc Third Circuit drew a distinction between dangerous crimes, which have a long history of disarmament in this country, and nondangerous crimes lacking such history. *Id.* at 230. In the absence of the Government showing that a defendant "poses a physical danger to others or that [the predicate

offense] is closely associated with physical danger," not all felonies—or "even misdemeanors that federal law equates with felonies"—support permanent disarmament. *Id.* at 230; *see United States v. Williams*, 113 F.4th 637, 658–61 (6th Cir. 2024) (distinguishing crimes against the person, crimes like burglary and drug trafficking that "pose a significant threat of danger," and nondangerous crimes); *see also United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) (when a defendant has a history of "dangerous and violent crimes," he can be constitutionally dispossessed of a firearm under Section 922(g)(1)). But McCuin has been convicted of three violent, dangerous crimes, none of which are similar to food-stamp fraud. Accordingly, punishing McCuin for being a felon-in-possession of a firearm under Section 922(g)(1) does not violate his Second Amendment rights. McCuin's as-applied challenge therefore fails.

### iv.  McCuin's Facial Challenge

McCuin also brings a facial challenge to Section 922(g)(1). "To sustain a facial challenge, 'the challenger must establish that no set of circumstances exists under which the statute would be valid.'" *Diaz*, 116 F.4th at 471 (citing *Salerano*, 481 U.S. at 745). But, "[t]his [McCuin] cannot do, because the statute is constitutional as-applied to the facts of his own case." *Diaz*, 116 F.4th at 471-72 (citing *Rahimi*, 144 S. Ct. at 1898.) Accordingly, where McCuin's as-applied challenge fails, he cannot sustain a facial challenge. *See United States v. Charles*, No. 23-50131, 2025 WL 416092, *1 (5th Cir. Feb. 6, 2025) (holding that *Diaz* forecloses a facial challenge to Section 922(g)(1)).

### B.  Binding Fifth Circuit precedent bars McCuin's Commerce Clause challenge

Alternatively, McCuin challenges Section 922(g)(1) under the Commerce Clause. Specifically, McCuin argues that Section 922(g)(1) violates the Commerce Clause because *United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995) is inconsistent with

*Scarborough v. United States*, 431 U.S. 563, 97 S. Ct. 1963, 52 L. Ed. 2d 582 (1977). In *Lopez*, the Supreme Court held that "the proper test [to evaluate Congress' power under the Commerce Clause] requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Lopez*, 514 U.S. at 559. In *Scarborough*, however, the Supreme Court required only a "minimal nexus that the firearm have been, at some time, in interstate commerce." *Scarborough*, 431 U.S. at 575. McCuin contends that Section 922(g)(1)'s application to the possession of a firearm that itself traveled across state lines, without the defendant having brought it across himself, satisfies *Scarborough* but does not satisfy *Lopez*. [32], p. 17. And accordingly, *Scarborough* impermissibly extends Congress' Commerce Clause power to purely local activity. *Id.*[4]

Undoubtedly, the relationship between *Lopez* and *Scarborough* has faced scrutiny in this circuit and beyond.

> *Scarborough* is in fundamental and irreconcilable conflict with the rationale of the United States Supreme Court in [*Lopez*]. . . . Consequently, the 'minimal nexus' of *Scarborough* can no longer be deemed sufficient under the *Lopez* requirement of substantially affecting interstate commerce. . . . The mere fact that a felon possesses a firearm which was transported in interstate commerce years before the current possession cannot rationally be determined to have a substantial impact on interstate commerce as of the time of current possession."

*United States v. Kuban*, 94 F.3d 971, 977-78 (5th Cir. 1996) (DeMoss, J., dissenting in part). More recently, Judge Ho commented on the "number of circuit judges nationwide [who] have noted the fundamental inconsistency between *Lopez* and *Scarborough*." *United States v. Seekins*, 52 F.4th 988, 991 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc). At the Supreme Court, Justice Thomas also remarked on the incompatibility between the two cases: "*Scarborough*, as the lower courts have read it, cannot be reconciled with *Lopez*. . . . [Y]ears ago in *Lopez*, [the Supreme

---

[4] "There is no allegation that Mr. McCuin, who has resided in Mississippi since childhood, traveled across state lines himself with the firearms or engaged in sales transactions across state lines." [32], pg. 2.

Court] took a significant step toward reaffirming th[e] Court's commitment to proper constitutional limits on Congress' commerce power. If the *Lopez* framework is to have any ongoing vitality, it is up to th[e] Court to prevent it from being undermined by a 1977 precedent that does not squarely address the constitutional issue." *Alderman v. United States*, 562 U.S. 1163, 131 S. Ct. 700, 702, 703, 178 L. Ed. 2d 799 (2011) (Thomas, J., dissenting from the denial of certiorari).

Despite this scrutiny, numerous cases in the Fifth Circuit analyzing Section 922(g)(1) under the *Lopez* test have upheld that statute's validity. In *Diaz*, where that defendant also brought a Commerce Clause challenge, the Fifth Circuit panel did not analyze his argument at all, holding that it was "foreclosed under this court's precedent." *Diaz*, 116 F.4th at 462 ("We spend no more words on that subject.") (citing *United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013) (holding Section 922(g)(1) to be a valid exercise of Congress's Commerce Clause authority)).

In *United States v. Rawls*, 85 F.3d 240 (5th Cir. 1996), the Fifth Circuit first considered *Lopez*'s effect on the constitutionality of Section 922(g)(1). The *Rawls* panel found that a gun in the possession of the defendant in Texas that had been manufactured in Massachusetts and transported through interstate commerce "was sufficient to establish a past connection between the firearm and interstate commerce." *Rawls*, 85 F.3d at 243; *see id.* (Garwood, J., specially concurring) ("Nothing in *Lopez* expressly purports to question *Scarborough*, and indeed it is not even cited in *Lopez*."). No case in this circuit has reached an opposite result. *See United States v. De Leon*, 170 F.3d 494, 499 (5th Cir. 1999) ("This court has repeatedly emphasized that the constitutionality of § 922(g)(1) is not open to question."); *United States v. Daugherty*, 264 F.3d 513, 518 (5th Cir. 2001) ("[T]he constitutionality of § 922(g) is not open to question."); *see also United States v. Schmidt*, 487 F.3d 253, 255 (5th Cir. 2007) (holding that *Lopez*, *Jones*, and *Morrison* "do not

alter th[e] conclusion that" Section 922(g)(1) is constitutional) (citing *Lopez*, 514 U.S. 549; *Jones v. United States*, 529 U.S. 848, 120 S. Ct. 1904, 146 L. Ed. 2d 902 (2000); *United States v. Morrison*, 529 U.S. 598, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000)).

In 2014, the Fifth Circuit again rejected the argument that the charged defendant must have been the one who transported the weapon in interstate commerce or engaged in "economic activity" involving the weapon. *United States v. Collins*, 573 F. App'x 374, 375 (5th Cir. 2014). "There is no additional requirement that, to apply the law constitutionally, the government must prove some economic activity beyond the interstate movement of the weapon." *Id.* (citing *United States v. Meza*, 701 F.3d 411, 418 (5th Cir. 2012)).

Accordingly, this Court finds that it is bound by a long line of Fifth Circuit cases holding Section 922(g)(1) to be a valid exercise of the Commerce Clause power. And as the cases have made clear, for a defendant to be charged under Section 922(g)(1), only the gun itself needs to have at some point traveled in interstate commerce. Section 922(g)(1) does not require that the defendant himself be the one to have transported the weapon. That interpretation complies with *Lopez*'s reading of the Commerce Clause. Thus, McCuin's contention that he did not "travel[] across state lines himself with the firearms or engage[] in sales transactions across state lines" is irrelevant to this Court's analysis. [32], p. 2. The fact that the Smith & Wesson .380 handgun traveled in interstate commerce before McCuin possessed it is enough. [22], p. 7. Therefore, McCuin's Commerce Clause argument fails. The Court shifts to McCuin's Equal Protection arguments.

### C. McCuin's Equal Protection arguments fail because states may impose different punishments for the same or similar crimes

McCuin argues that Section 922(g)(1) violates his Fifth and Fourteenth Amendment Equal Protection rights. [32], p. 15. In its supplemental briefing, the Government reasons that

*Darrington*'s Equal Protection holding—that Section 922(g)(1) does not violate Equal Protection principles—remains binding on this Court because the Fifth Circuit did not consider an Equal Protection challenge in *Diaz*. [54], p. 7. Post-*Diaz*, the Fifth Circuit applied *Darrington* to reject an Equal Protection challenge to Section 922(g)(1). *United States v. Howard*, No. 24-40033, 2024 WL 4449866 (5th Cir. Oct. 9, 2024), *cert. denied*, 145 S. Ct. 1210 (2025). But the *Howard* panel applied only a plain-error standard of review. *Id.* at *2 ("[T]he purported error is not clearly obvious in the absence of controlling authority establishing that the right to keep and bear arms is a fundamental right.") (citations omitted). As McCuin points out, "in the plain error context, 'a lack of binding authority is often dispositive.'" *United States v. Jones*, 88 F.4th 571, 573 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 1081, 218 L. Ed. 2d 253 (2024) (citations omitted).[5]

This Court is not fully convinced that *Darrington* continues to have precedential effect, even in the Equal Protection context. The Fifth Circuit unequivocally stated in *Diaz* that it was "abandon[ing its] prior precedent." *Diaz*, 116 F.4th at 465. Now, the Government argues that only *Darrington*'s Second Amendment analysis was affected by *Diaz*. [54], p. 7. Even though the Fifth Circuit could have relied on *Darrington* for its Commerce Clause analysis, it chose not to, relying instead on a different line of cases—those that did not apply the abandoned means-end scrutiny test—to uphold Section 922(g)(1) under the Commerce Clause. *See Diaz*, 116 F.4th at 462. The

---

[5] At the February 25, 2025, Motion Hearing, the Court asked counsel for McCuin and the Government to provide the Court with any relevant, emerging Fifth Circuit cases addressing challenges to Section 922. McCuin directed the Court to *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583, 586 (5th Cir. 2025), in which the Fifth Circuit ruled unconstitutional Sections 922(b)(1) and (c)(1), which together prohibit the sale of handguns to eighteen-to-twenty-year-old adults. Although not relevant to this Court's Section 922(g)(1) Second Amendment analysis, McCuin cited the case in favor of his Equal Protection argument. While the *Reese* panel did not reach the Equal Protection arguments because it found the challenged sections to be facially unconstitutional, McCuin argues that the panel "did not make any kind of statements that that equal protection claim was foreclosed or was not properly brought before the Court," indicating "that it is still an issue that the Fifth Circuit plans to address post-*Diaz* now." [82], pps. 44-45.

Fifth Circuit could have relied on *Darrington* for its Commerce Clause analysis but did not, casting doubt on *Darrington*'s Equal Protection holding. Of course, if *Darrington* still controls for Equal Protection, then this Court's job is done. But out of an abundance of caution, the Court will undertake a Section 922(g)(1) Equal Protection analysis as if there were no binding precedent on the issue.

Notably, prior cases in this circuit found Equal Protection arguments against Section 922(g)(1) failed because "Section 922(g)(1) cannot be said to unevenly burden Second Amendment rights that do not exist." *United States v. Locket*, No. 22-072, 2023 WL 5153549, *5 (S.D. Tex. Aug. 10, 2023). But *Diaz* rejected the proposition that felons are categorically prohibited from Second Amendment protection. *Diaz*, 116 F.4th at 466 (rejecting the government's argument that Diaz, a felon, was not among "the people" protected by the Second Amendment). So, although McCuin himself is a felon, he too falls under the ambit of the Second Amendment, and to strip his right to possess a firearm must not offend Equal Protection principles.

The Equal Protection Clause is found in the Fourteenth Amendment and ensures that no state may "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV. The Fourteenth Amendment, however, applies only to actions taken by states, not the federal government. *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 543 n.21, 107 S. Ct. 2971, 97 L. Ed. 2d 427 (1987). In *Bolling v. Sharpe*, the Supreme Court reverse incorporated the Fourteenth Amendment's Equal Protection Clause against the federal government, through the Fifth Amendment's Due Process Clause. *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S. Ct. 693, 98 L. Ed. 884 (1954), *supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294, 75 S. Ct. 753, 99 L. Ed. 1083 (1955); *see United States v. Windsor*, 570 U.S. 744, 774,

133 S. Ct. 2675, 186 L. Ed. 2d 808 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."). The Fifth Amendment provides that no one shall "be deprived of life, liberty, or property without due process of law." U.S. CONST. AMEND. V. Accordingly, "Fifth Amendment equal protection claims against federal actors are analyzed under the same standards as Fourteenth Amendment equal protection claims against state actors." *Butts v. Martin*, 877 F.3d 571, 590 (5th Cir. 2017). And "in the administration of criminal justice," Equal Protection has been held to mean that "no different or higher punishment should be imposed upon one such as is prescribed to all like offenses." *Yick Wo v. Hopkins*, 118 U.S. 356, 367-68, 6 S. Ct. 1064, 30 L. Ed. 220 (1886).

Here, McCuin specifically argues that Section 922(g)(1) treats "identically situated persons differently" because the statute—which makes it illegal for someone convicted of a crime punishable by imprisonment of longer than one year to possess a firearm—relies on underlying state criminal convictions. [58], p. 5. McCuin contends that in some cases, states punish the same crimes differently, and what serves as the predicate offense in one state may not necessarily be sufficient in another state. *Id*. McCuin also argues that Section 921 (which provides that expunged or pardoned crimes cannot serve as Section 922 predicate offenses) further violates Equal Protection principles because different states also have different restoration schemes. *Id*.

This Court is not aware of a single state that does not classify McCuin's predicate state offenses as felonies punishable by more than a year: transfer of methamphetamine, drive-by shooting, and burglary. More broadly, to follow McCuin's argument to its conclusion would disregard state sovereignty and federalism. "It is not the business of courts to spar over the appropriate level of generality to apply when counting the noses of fifty different State laws and

State constitutional provisions." *Hopkins v. Watson*, 108 F.4th 371, 390 (5th Cir. 2024) (internal citation omitted). The Constitution does not mandate that each state punish its criminals in perfect lockstep. "Absent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will always bear the distinction of treating particular offenders more severely than any other State." *Rummel v. Estelle*, 445 U.S. 263, 282, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980); *see United States v. Holmes*, 11 F. App'x 408, 409 (6th Cir. 2001) ("A wide disparity between sentencing schemes of different jurisdictions does not violate equal protection, even where two persons who commit the same crime are subject to different sentences."). The fact that two states may have levied varying sentences on McCuin for his prior felonies, or even that they may have taken longer to return his civil rights after the completion of those sentences, does not mean that Section 922(g)(1) violates McCuin's Equal Protection guarantees. Rather, Section 922(g)(1) uniformly punishes those with state felonies, requiring that such felonies be punishable by at least one year.

This Court rejects McCuin's argument that because states punish crimes unevenly, and return civil rights to past criminals unevenly, Section 922(g)(1) treats McCuin differently than a similarly situated person. McCuin has not alleged that the Government has treated him differently than another person charged with the same crimes under Mississippi or Florida law would be treated. His predicate felonies that made his possession of a firearm unlawful would serve as predicate offenses in virtually any other jurisdiction.[6] Accordingly, McCuin's Equal Protection argument fails, and the Court finds that his charge under Section 922(g)(1) does not run afoul of the Fifth Amendment. Having disposed of each of McCuin's arguments regarding Section

---

[6] To be sure, McCuin does not argue that Mississippi or Florida's criminal laws violate Equal Protection— only that Section 922(g)(1) does.

922(g)(1),[7] McCuin's Motion to Dismiss [31] is denied, and the Court will now discuss his Motion

to Suppress [59].

## III. MOTION TO SUPPRESS

McCuin has moved to suppress the statements he made during his February 7, 2024,

custodial interview with a Special Agent from the Bureau of Alcohol, Tobacco, Firearms, and

Explosives ("ATF"). [59], p. 1. In response, the Government conceded that McCuin "made an

unequivocal request for an attorney," in the middle of that interview, around eight minutes and 22

seconds in. [67], p. 2. Accordingly, the Government agreed at the February 25, 2025, Motion

Hearing that it will not use any statements made after that point in the interview at trial. Statements

made before that point, however, remain at issue. The Court finds that McCuin's statements made

after being read his *Miranda* rights and invoking his right to counsel will be inadmissible at trial.

McCuin's Motion to Suppress [59] is therefore granted.

### A. Legal Standard

Under the Fifth Amendment, "[n]o person . . . shall be compelled in any criminal case to

be a witness against himself." U.S. CONST. AMEND. V. As a result, "a suspect subject to custodial

---

[7] In supplemental briefing, McCuin also argues that Section 922(g)(1) is unconstitutionally vague because it does not put an ordinary person on fair notice of whether possessing a firearm is constitutionally permitted or will expose them to federal prosecution. [55], pps. 8-9. This argument fails. As the Supreme Court has found, "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32, 83 S. Ct. 594, 9 L. Ed. 2d 561 (1963). Rather, a defendant "must show that the statute is vague in his case." *United States v. Clark*, 582 F.3d 607, 614 (5th Cir. 2009). As this Court found, McCuin was convicted of three dangerous predicate offenses prior to his instant arrest. Accordingly, "an ordinary person would have sufficient notice that [McCuin's] alleged conduct comes within the terms of [Section 922(g)(1)]." *United States v. Celestine*, No. CR 24-92, 2025 WL 522643, *4 (E.D. La. Feb. 18, 2025). This Court joins several others in finding that, post-*Diaz*, Section 922(g)(1) is not vague when applied to felons who have exhibited dangerous conduct. *See, e.g., id.* (Section 922(g)(1) not void for vagueness in the context of a predicate burglary conviction); *United States v. Hill*, No. CR 24-97, 2025 WL 562762, *5 (E.D. La. Feb. 20, 2025) (same for aggravated assault); *United States v. Staeger*, No. 1:24-cr-108-HSO-BWR-1, 2025 WL 605053, *4 (S.D. Miss. Feb. 25, 2025) (finding Section 922(g)(1) not vague when the defendant had a predicate offense for possessing a controlled substance); *United States v. Hines*, No. CR 23-276, 2025 WL 974238, *8 (E.D. La. Apr. 1, 2025) (same finding where defendant had a predicate offense for possession with intent to distribute crack cocaine).

interrogation has the right to consult with an attorney and to have counsel present during questioning, and [] police must explain this right to him before questioning begins." *Davis v. United States*, 512 U.S. 452, 457, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994) (citing *Miranda v. Arizona*, 384 U.S. 436, 469-73, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). The *Miranda* right to counsel was part of a "series of recommended 'procedural safeguards' . . . [that] were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected." *Michigan v. Tucker*, 417 U.S. 433, 443-44, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974). And, "[t]he *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions." *Berghuis v. Thompkins*, 560 U.S. 370, 387, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010).

"It is black letter law that when a suspect who is subject to custodial interrogation exercises his right to counsel, law enforcement officers must cease questioning until counsel is made available to him, unless the accused himself initiates further communication, exchanges or conversations with the officers." *United States v. Montes*, 602 F.3d 381, 385 (5th Cir. 2010) (citing *Edwards v. Arizona*, 451 U.S. 477, 485-86, 101 S. Ct. 1880, 68 L. Ed. 2d 37 (1981)). If a suspect invokes his right to counsel, but that invocation is ignored by law enforcement officers, the suspect's statements made after the request should be excluded by the trial court. *Id.*

For a suspect's invocation of his *Miranda* rights to have effect, it must not be ambiguous or equivocal. *See Davis*, 512 U.S. at 459. But, as the Supreme Court has recognized, a valid invocation may be limited in its scope. *See Connecticut v. Barrett*, 479 U.S. 523, 530, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987) (A defendant's oral statements to police were admissible after the defendant declined

to make a written statement without counsel present); *see also United States v. Rought*, 11 F.4th 178, 188 (3d Cir. 2021) (collecting cases and recognizing that an invocation may not only be limited by mode, such as written versus oral, but may also be limited by topic or subject matter); *United States v. Ivy*, 929 F.2d 147, 153 (5th Cir. 1991) (holding that a suspect made a valid, limited invocation by "express[ing] his unwillingness to answer questions about where he obtained materials to make a bomb"). As the Third Circuit explained in *Rought*, once a suspect makes a limited invocation, "[t]his means no more questions about not only the covered topic, but also about any topics 'that the police should know are reasonably likely to elicit an incriminating response from the suspect' about the covered topic." *Rought*, 11 F.4th at 189 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)).

## B. The Special Agent's Questioning Should Have Stopped After McCuin's Invocation

Here, the Government does not dispute that McCuin invoked his right to counsel at the eight minute and 22 second mark of the recorded custodial interview that took place on February 7, 2024, between McCuin and the Special Agent. [85], pps. 1-2. What is in dispute, however, is whether the statements made before that point in the interview will be admissible at the trial of this matter. McCuin argues that after the Special Agent gave him his *Miranda* rights, he invoked them, and "the conversation should have ended" in accordance with *Edwards*. *Id.* at pps. 4-5 (citing *Edwards*, 451 U.S. at 486 n.9). The Court agrees.

Twenty-two seconds after the Special Agent first walked into the interrogation room, McCuin says, "I don't wanna answer questions from nobody." [80], p. 1.[8] The Special Agent responds, "All right, but in the long run this may help you out, okay," and identifies himself to

---

[8] This and the other timestamps referenced by the Court are from the Court viewing the video of McCuin's custodial interview. *See* [96].

McCuin as an agent with the ATF. *Id.* The two have a back-and-forth, during which the Special

Agent tells McCuin, "hey, you got every right to say, 'hey man, I don't want to talk, I just want to

bond out.' Okay, guess what? Now, I don't know what happened from you." *Id.* at p. 2. McCuin

asks the Special Agent if he is in federal custody, and the Special Agent tells McCuin that he is not,

but that he will read McCuin his rights because "that's the procedure . . . with the Department of

Justice." *Id.* "So let me do things correct so it's fair to you." *Id.* The Special Agent then reads

McCuin his *Miranda* rights from a statement of rights form. *Id.* at p. 3. To this point, the Special

Agent has not asked McCuin any questions relating to his arrest. The Special Agent continues

reading from the form, which includes a section on waiver. As the Special Agent explains the waiver

section, this exchange ensues:

> Special Agent: [The waiver]'s just saying, I'm not forcing you to talk. I'm not
> basically telling you have to talk. I'm just saying in order for me to evaluate things. I
> have to know from both sides, the report from the officer and from your side, so that
> I can make a correct assessment. You understand that?
>
> McCuin: umhmm
>
> Special Agent: Okay so if you agree with that, um just sign and then print your name
> here.
>
> [McCuin, holding an ink pen, begins to read the waiver form to himself]
>
> McCuin: I have read this statement of my rights or it has been read to me, and I
> understand these rights. At this time, I am willing to answer questions without a
> lawyer present. *Naw, I . . . I'd rather like, I mean, I don't want to waive my rights. I don't
> want to do that, but uh I want . . . I want my lawyer present whenever I do answer questions
> because I like, but I will make one quick statement.* I will make, alright, the I was riding
> in the car with somebody . . ."

[80], p. 3 (emphasis added).

At this point, in the middle of making his "one quick statement," McCuin was interrupted

by the Special Agent and was not able to finish his statement. "Okay but look, look, look, look, I

understand, I understand what you're saying. You going into what happened and guess what, I want to know that, so I can make a good accurate report that's fair to both sides."[9] *Id.* at p 4. During the Special Agent's statement, frustrated that he has been interrupted, McCuin drops his pen. After the Special Agent concludes, McCuin says, "Obviously you don't [understand], because I'm not signing my rights, I'm not signing, I'm not waiving rights, I'm not waiving rights."

McCuin finishes this statement four minutes and two seconds into his interrogation. From the time the Special Agent walks into the interrogation room eight seconds after the video begins, until McCuin finishes that statement at 4:02, is a span of just under four minutes. And in those four minutes, in addition to visibly refusing to sign the "Waiver of Rights" form, McCuin says the following statements to the Special Agent:

- "I don't wanna answer questions from nobody."

- "I don't want to waive my rights."

- "I don't want to do that."

- "I want my lawyer present whenever I do answer questions."

- "I'm not signing my rights."

- "I'm not signing."

- "I'm not waiving rights."

- "I'm not waiving rights."

Arguably, McCuin invokes his *Miranda* rights at the three minute and 35 second mark when he refuses to sign the waiver form and says, "I don't want to waive my rights. I don't want to do that, but uh I want, I want my lawyer present whenever I do answer questions . . ." [80], p. 3. But at the

---

[9] "Both sides" seemingly refers to the state law enforcement officers who made the arrest and to McCuin.

very least, when McCuin responds to being interrupted by saying, "I'm not signing my rights, I'm not signing, I'm not waiving rights, I'm not waiving rights," there is no doubt that his rights have been invoked, four minutes and two seconds into the interview. *Id.* at p. 4.

After McCuin had been given his *Miranda* warnings, had clearly and unequivocally invoked his right to counsel, and had made his one statement—without being interrupted—questioning should have ceased until McCuin was provided the assistance of counsel. *See Montes*, 602 F.3d at 385; *Davis*, 512 U.S. at 459. The fact that McCuin, along with his request for counsel, attempted to make one quick statement, does not invalidate that request for counsel. *See* 2 Wayne R. LaFave et al., *Crim. Proc.* § 6.9(g) (4th ed., Nov. 2024 update) ("It is possible that the defendant's invocation of his right to counsel will be limited in some way, in which case application of the *Edwards* rule[—that questioning immediately cease—]is limited to the same extent . . ."). Coupled with his refusal to sign the waiver form, McCuin's statements evinced an unwillingness to speak with law enforcement in the absence of counsel, such as when he began his conversation with the Special Agent by stating, "I don't want to answer no questions from nobody." [80], p. 1.

It is true that "the mere refusal to sign a waiver does not automatically render inadmissible all further statements of the defendant." *United States v. McDaniel*, 463 F.2d 129, 135 (5th Cir. 1972) (citations omitted). But when a defendant refuses to sign an express waiver, and his course of conduct, such as words spoken or actions taken, shows an unwillingness to speak with law enforcement, the defendant has not made a "meaningful waiver." *See McDonald v. Lucas*, 677 F.2d 518, 521 (5th Cir. 1982) (on review of a federal habeas petition, the Fifth Circuit held that it was reversible error for the trial court to admit the defendant's statements when he had refused to sign a waiver and his course of conduct, including limited answers to questioning, did not constitute an

implied waiver). Moreover, just because the defendant makes an inculpatory statement during questioning, this alone cannot indicate waiver. *Id.* at 522.

After McCuin repeatedly states that he is not signing away or waiving his rights, the Special Agent says: "Okay, look, you don't have to sign this. I can put this away and you can say, okay, I agree to talk with you. So, you can tell me what happened. Are you good with that?" [80], p. 4. McCuin responds, "Yeah." *Id.* The Special Agent asks, "Okay, you good with talking to me?" And McCuin answers, "I'm good with talking to you until I don't want to answer questions no more." *Id.* Soon after, McCuin also tells the Special Agent: "I'm trying to tell you what happened bruh. If you want to listen, you can listen." *Id.*

The Government attempts to reframe McCuin's post-invocation statements to cast doubt on McCuin's invocation. [84], p. 3. This, however, the Government may not do. As the Supreme Court held in *Smith v. Illinois*, 469 U.S. 91, 100, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984), "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." (emphasis original); *see United States v. Sanders*, 133 F.4th 341, 367 (5th Cir. 2025) (Though harmless error, the Fifth Circuit cited *Smith* and concluded that a police officer's clarifying question was improper in response to an unambiguous request for an attorney); *United States v. Guerra*, No. CR 6:18-120-2, 2021 WL 391725, *6-7 (S.D. Tex. Feb. 2, 2021) (citing *Smith* and granting the defendant's motion to suppress where law enforcement improperly tried to "encourage [the defendant] to cooperate with the government" after the defendant explicitly invoked his right to remain silent).[10] Otherwise, "police could disregard a

---

[10] *See also Manley v. State*, 698 S.E.2d 301 (Ga. 2010) (when defendant unequivocally asked for a lawyer, but police improperly made efforts at "clarification" that produced ambiguity, that does not affect prior invocation of the right); *Carr v. State*, 934 N.E.2d 1096 (Ind. 2010) (after defendant's unequivocal request for counsel, any continued questioning bars state reliance on "defendant's subsequent apparent waiver of equivocation as to his right to counsel");

defendant's invocation of his rights in the hope that subsequent interrogation would cast retrospective doubt upon it." 2 Wayne R. LaFave et al., *Crim. Proc.* § 6.9(g) (4th ed., Nov. 2024 update).

To be clear, this Court does not find that law enforcement officers may not use clarifying questions *before* the suspect unequivocally requests counsel to determine whether the suspect is willing to speak to police without counsel. But the *Edwards* rule and its progeny make clear that once the right to counsel has been clearly and unequivocally invoked, questioning must cease until the defendant has had the assistance of counsel or he later waives that right.[11] After McCuin invoked his right to counsel four minutes and two seconds into his custodial interview with the Special Agent, questioning should have ended. [96]. Accordingly, McCuin's Motion to Suppress [59] is granted, and any statements made after McCuin's invocation are inadmissible at trial.

## IV. CONCLUSION

IT IS THEREFORE ORDERED AND ADJUDGED that Defendant Jesse Ray McCuin's Motion to Dismiss Indictment [31] is DENIED.

---

*State v. Ray*, 659 N.W.2d 736 (Minn. 2003) (after defendant's unequivocal request for counsel, police "engaged in an impermissible effort to persuade Ray to withdraw his request for counsel").

[11] The Government argues, in the alternative, that McCuin waived his *Miranda* rights by continuing to talk to the Special Agent and wanting to tell him "his version of events." [84], p. 5. This argument also fails, however, because McCuin could not have waived his right to counsel by continuing to converse with the Special Agent. Under *Edwards*, one of the chief considerations for a court in determining whether a defendant waived his right to counsel is whether the defendant "reopened the dialogue with the authorities." *Edwards*, 451 U.S. at 486 n.9. McCuin could not have reopened the dialogue if the Special Agent initiated the original dialogue and never allowed the original dialogue to end. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983); *see also* 2 Wayne R. LaFave et al., Crim. Proc. § 6.9(f) n.153 (4th ed., Nov. 2024 update).

IT IS FURTHER ORDERED AND ADJUDGED that Defendant Jesse Ray McCuin's Motion to Suppress [59] is GRANTED.

THIS, the 1st day of May, 2025.

              **TAYLOR B. McNEEL**
              **UNITED STATES DISTRICT JUDGE**